UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID M. JOHNSON,

       Plaintiff,

v.

ATLAS COPCO TOOLS & ASSEMBLY
SYSTEMS, INC.,

       Defendant.

_____/

Case No. 04-73170

Honorable Nancy G. Edmunds


**ORDER DENYING DEFENDANT'S MOTION *IN LIMINE* [48] AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [47]**


This employment dispute comes before the Court on Defendant Atlas Copco Tools
& Assembly Systems, Inc. ("Atlas Copco Tools & Assembly")'s motions *in limine* and for
summary judgment seeking to dismiss Plaintiff David Johnson's federal and state law
claims of age discrimination and state-law claim of national origin discrimination.
Defendant's motion *in limine* is DENIED.  As Plaintiff concedes, the challenged evidence
is circumstantial, as opposed to direct, evidence of age discrimination that is properly
addressed in the context of Defendant's summary judgment motion.  Defendant's motion
for summary judgment is GRANTED as to Plaintiff's state law claim for national origin
discrimination and as to Plaintiff's state and federal claims of age discrimination.

**I.    Facts**

Atlas Copco Corporation (not a party to this action) is a diversified, multi-national
industrial and manufacturing company based in Stockholm, Sweden.  Defendant Atlas

Copco Tools & Assembly is one of its associated companies located in the United States. It sells and services computerized industrial tools in the United States and Canada, which are used extensively in the automobile and other industries.

Plaintiff was employed by Defendant Atlas Copco Tools & Assembly, or a predecessor, or a related company, from 1987 until his termination on August 31, 2002 at the age of 50. (Compl. ¶ 3.)

In 1987, Atlas Copco Corporation acquired the company where Plaintiff was employed, Chicago Pneumatic. In 1991, Plaintiff became the president of Advanced Fastening Systems, which later changed its name to Atlas Copco Assembly Systems. Plaintiff held that position until December 31, 2000. (Johnson Dep. at 15-17.)

In late 2000, the parent company reorganized its sales organizations in Europe, North America and South America. In each of these regions, there had been two separate organizations: one selling standard industrial tool systems and another selling customized systems. The reorganization merged the two companies. (Johnson Dep. at 20-21.)

In North America, the company that sold the standard tool systems was called Atlas Copco Tool Systems, and Fredrik Moller was its president. The company that sold customized tool systems was called Atlas Copco Assembly Systems, and Plaintiff was its president. (Johnson Dep. 15-17.) The 2000 reorganization merged the two companies to create Defendant Atlas Copco Tools & Assembly Systems, and Fredrik Moller became its president. These decisions were made by Peter Moller, a division president with the parent company. (P. Moller Dep. at 55-56.)[1] (Peter and Fredrik Moller are not related.)[2] Plaintiff

---

[1]Peter Moller testified that he chose Fredrik Moller rather than Plaintiff David Johnson for the following reasons:

does not assert any discrimination claims arising out of this employment action.  (Am. Compl.)

After discussions with Peter Moller about his future with the newly merged company, Plaintiff accepted a position as its Executive Vice-President for motor vehicle industry marketing.  (Johnson Aff. ¶ 3; Johnson Dep. at 23-27.)  Peter Moller testified that he made a written offer to Plaintiff on November 27, 2000 for this position because he thought Plaintiff had done a good job in his prior position, that Plaintiff "deserved a chance in the new organization", and that it "was a good development for him in that position" because if he did a really good job, "he should – could have been the successor of Fredrik."  (P. Moller Dep. at 53-54, 58-60.)  Peter Moller told Plaintiff that Fredrik was a Swedish national who was in the United States for a limited period of time on a work visa, that Fredrik would

---

Q:     What was the reason you didn't consider David Johnson for the presidency of the customer center?

A:     Well, there was several reasons.  Number one reason is that Fredrik Moller is an extraordinarily high performance individual.  He's a better manager.  For that type of job, not for the type of job that David had before, because that was much more engineering, but for this type of sales oriented operation because this was 80 percent sales operation driving the business, so he was the high energy of these two individuals.

The second one is that Fred – the tools was the bigger of the two operations.

The third reason is that the main driver of this is sales.  Where Fredrik has his background in sales and marketing, David has more strength within engineering administration.  It's both a profile of the persons and the profile of the job.

(P. Moller Dep. at 55-56.)

[2]Johnson Dep. at 27.

3

"probably take a new job assignment", and if Plaintiff did "a really good job, [he would] be on the list to take over after Fredrik after that."  (P. Moller Dep. at 60-61.)

The written offer that Plaintiff accepted acknowledged his "very good performance" while working for Atlas Copco Assembly Systems, that his position as president had been eliminated due to the corporate reorganization, and that the duties of his new position would be finalized by Plaintiff and Fredrik Moller.  (Pl.'s Ex. 1, 11/27/00 Offer from Atlas Copco to David M. Johnson.)   It also provided that Plaintiff would get the same compensation package he got in his previous position, "including wages, bonus program, benefits", etc., for the next 24 months and that his base salary would not "be reduced below its current level."  If, however, during that 24 month period, Plaintiff decided "for any reason not to continue his employment with Atlas Copco or its subsidiaries, he [was] entitled to receive 12 months base salary, payable as a lump sum 15 days after termination of employment."  The 12 months salary would also be payable to Plaintiff "if his employment is terminated by the company for any reason, other than for cause" but Atlas Copco retained the right to immediately cancel the agreement if Plaintiff were "guilty of unlawful act or breach of faith with respect to Atlas Copco".  (*Id.*)  The agreement also promised Plaintiff pension and insurance benefits for 12 months or until Plaintiff obtained such benefits through another employer, whichever first occurred; and the cost of job placement services, not to exceed 12 months.  (*Id.*)

Plaintiff assumed his new position on January 1, 2001 and directly reported to Fredrik Moller who was responsible for evaluating his job performance.  (P. Moller Dep. at 35-36.) Fredrik Moller noticed problems in Plaintiff's performance in this new position as executive vice president of marketing; i.e., that he "didn't put his energy into the job", that he "on a

4

number of occasions slept during meetings", that he did not seem like "he was interested in the marketing job at all", and was not satisfactorily performing many of the duties of his new job; and was not presenting a sufficient number of presentations or written reports concerning competitor analysis. (F. Moller Dep. at 41-49.)  Others in the company made similar complaints to Fredrik Moller about Plaintiff's sleeping during meetings, his being on the internet instead of working, and his poor job performance as did outside distributors. (F. Moller Dep. at 49-55; Timmins Dep. at 36-40, 45-46.)  During this same time period, additional employees in the company observed Plaintiff sleeping at meetings, working on his computer on nonbusiness-related items, noticed that he seemed unhappy in his job and in what he was doing, and tried to get him to work harder and get motivated.  (Bulow Dep. at 62-66; Thorsrud Dep. at 35-37.)  Fredrik told Peter Moller about Plaintiff's poor job performance and that other employees had complained about his performance as well as distributors.  (P. Moller Dep. at 67-70.)

Beginning in August 2001, Fredrik Moller had verbal discussions with Peter Moller about his dissatisfaction with Plaintiff's performance but did not notify Plaintiff of his dissatisfaction either verbally or in writing.  (F. Moller Dep. at 45-47, 51-52, 54-55; P. Moller at 64.)  Fredrik testified that he did not do so because "Peter Moller wanted to have the feedback discussion with Dave Johnson."  (F. Moller Dep. at 46.)  It was his understanding that Peter Moller was going to talk to Plaintiff about his performance deficiencies in September of 2001.  (F. Moller Dep. at 57-58.)  Peter Moller, on the other hand, testified that he would have expected Fredrik to sit down with Plaintiff and discuss performance concerns so he would have an opportunity to improve; that he did not consider it his job to do so.  (P. Moller Dep. at 71-73.)

5

Peter Moller considered Fredrik's assessments of Plaintiff's performance and also relied on his own personal observation that Plaintiff "didn't have the energy level that [was] needed", that he "was not deep enough into the issues. . . . that he was confronted with", that "he was not motivated", that "he thought that he was some special person instead of really part of the team", that "he had problems to move from being the boss to being part of the team, a bigger team."  (P. Moller Dep. at 65-66.)

In October 2001, Peter Moller met with Plaintiff and told Plaintiff that he would not be replacing Fredrik as President, that "it was better for him personally to start to find another job", and that he would support him because he thought he did a good job in his previous position before the merger.  (P. Moller Dep. at 73-74.)  Plaintiff testified that Peter Moller informed him that the opportunity to replace Fredrik was gone because Fredrik was staying longer and that he might want to consider another position outside the company.  (Johnson Dep. at 50.)  Plaintiff could not recall if he requested or Peter Moller offered, but he obtained a letter of recommendation from Peter to use in his job search.  (Johnson Dep. at 50-51.)  A November 27, 2001 draft of that letter of recommendation from Peter Moller states that, due to organizational changes of the global division's operations in North America, "David M. Johnson has decided to look for new challenges."  (Def.'s Ex. F, 11/27/01 letter.)  It further states that Plaintiff had a "proven track record of successfully managing" his pre-merger company and that Peter Moller "strongly recommend[s] David for a position similar to the one [he previously held] as President of Atlas Copco Assembly Systems, Inc."  (*Id.*)

Plaintiff made efforts to find a new job.  (Johnson Dep. at 55-59.)  On January 8, 2002, the Atlas Copco human resource manager e-mailed Plaintiff asking about his job search,

6

and Plaintiff replied that he was working with recruiters and pursuing the possible purchase of a Harley Davidson motorcycle dealership. (Def.'s Ex. G, 1/8/02 e-mail from Jeanette Livijn to Plaintiff and his 1/11/02 response.)

In March 2002, Anders Hoberg, a 35-year-old Swede began working as a consultant for Defendant, a position he first interviewed for in late Fall 2001. (Hoberg Dep. at 87-92; P. Moller Dep. at 87-92.)

On April 3, 2002, Peter Moller e-mailed Plaintiff, informing Plaintiff that he would be in Berlin for the April 17, 2002 meeting Plaintiff was scheduled to attend and wanted to have a discussion with him. Plaintiff responded that same day that he would arrive around noon and would meet with Peter. (Def.'s Ex. H, 4/3/02 e-mail and response.)

At that April 17, 2002 meeting, Plaintiff testified that Peter told him that "you didn't do anything wrong, but we've decided to separate your employment or words to that effect." (Johnson Dep. at 64.) Peter presented him with a separation agreement. Plaintiff told Peter that he would not sign it because it didn't meet the terms of his employment agreement. (Johnson Dep. at 62-65.) A few days later, Plaintiff returned to the United States and to his job. Plaintiff never asked why he was being asked to leave the company. (Johnson Dep. at 67.)

On April 30, 2002, Fredrik Moller told Plaintiff that his employment was going to be terminated, that he should not come to the office any more, and gave him another copy of a separation agreement for him to sign. Plaintiff once again refused, telling Fredrik that it was inconsistent with the terms of his employment agreement. (Johnson Dep. at 68-69; Johnson Aff. ¶ 6.) Plaintiff did not return to work after that date.

Plaintiff continued to be paid while the terms of his separation were being negotiated.

7

(Johnson Dep. at 71-72.)

On August 31, 2002, Plaintiff was terminated.  Fredrik Moller, as President of Atlas Copco Tools & Assembly, sent him a letter detailing the terms of his separation.  (Pl.'s Ex. 4, 8/29/02 letter.)  Plaintiff received the following:

.   his salary through the period ending August 31, 2002;

.   $ 30,475.31 reflecting his 2001 bonus and accrued vacation pay;

.   $   1,356.88 for cellular phone and club dues he claimed as expenses;

.   $195,000.00 for severance pay equal to 12 months' salary;

.   $ 25,000.00 for one year's pension benefits;

.   $   8,800.00 for medical benefits; and

.   $ 30,000.00 for outplacement assistance.

Thus, Plaintiff received a total of $290,632.19 and subsequently cashed the checks he received.  He refused to sign a release.  (Pl.'s Ex. 4, 8/29/02 letter.)

Anders Hoberg was hired to replace Plaintiff in September 2002 after Plaintiff was terminated.  (Hoberg Dep. at 70-72, 74, 76-78.)

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been wrongfully terminated in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621, *et seq.*  (Am. Compl. ¶ 5.)  After investigating, the EEOC dismissed the charge and issued Plaintiff a Right to Sue Notice.  (Am. Compl. ¶ 6.)

Plaintiff originally filed this suit on August 18, 2004, alleging that Defendant violated the ADEA and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101, *et seq.*, when it terminated and replaced him with Anders Hoberg, a 35-year-old Swede.

8

On August 8, 2005, this Court granted Plaintiff's unopposed motion to amend his complaint to add a claim of national origin discrimination.

Plaintiff's amended complaint, filed on August 23, 2005, adds the additional claim of national origin discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), and asserts that Atlas Copco Tool & Assembly discriminated against Plaintiff because of his national origin - United States – when it terminated him and replaced him with a Swedish national -- Anders Hoberg.  (Am. Compl. ¶¶ 29-30.)

This matter is presently before the Court on Atlas Copco Tools's motion for summary judgment seeking to dismiss Plaintiff's claims of age and national origin discrimination.

## II.   Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most

9

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Analysis

### A.  Age Discrimination

Plaintiff brings his discrimination claims under both the federal ADEA and Michigan's ELCRA, arguing that he was terminated because of his age.  Michigan courts look to federal law for guidance when reviewing claims of age discrimination based on that state's laws.  *Featherly v. Teledyne Indus., Inc.*, 486 N.W.2d 361, 364 (Mich. Ct. App. 1992). Plaintiff has the burden of establishing a prima facie case of age discrimination.  *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).  He can meet this burden either by presenting direct evidence that Defendant intentionally discriminated against him because of his age or by presenting circumstantial evidence, following the *McDonnell Douglas* burden-shifting analysis.  *Graham v. Ford*, 604 N.W.2d 713, 717 (Mich. Ct. App. 1999). Under either approach, Plaintiff must  establish "a causal link between the discriminatory animus and the adverse employment decision."  *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich.  2003).

In response to Defendant's motion *in limine*, Plaintiff concedes that he has only circumstantial evidence that Defendant terminated him because of his age. "Circumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does

allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003.)   Because Plaintiff is attempting to establish his age discrimination claim with circumstantial evidence, the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), is applied.   *Rowan*, 360 F.3d at 547.

The *McDonnell Douglas* burden-shifting framework consists of three stages.  Plaintiff must "first establish a prima facie case of age discrimination."  *Rowan*, 360 F.3d at 547. To establish a prima facie case of age discrimination, Plaintiff must prove that he:  (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by a younger person. *Lytle v. Malady*, 579 N.W.2d 906, 916 (Mich. 1998).

Once that is done, the burden shifts to Defendant, "who must give legitimate, non-discriminatory reasons for the adverse employment decision."  *Id.*  After Defendant satisfies this burden of production, Plaintiff must "establish that the legitimate reasons offered by [the Defendant] were just a pretext for decisions actually motivated by an unlawful bias against age."  *Id.*   Plaintiff can do this by showing  that the proffered reason:  (1) has no basis in fact; (2) did not actually motivate Defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct.  *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).  "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him."  *Id.* (internal quotes and citation omitted).

Defendant does not challenge Plaintiff's ability to establish a prima facie case of age

11

discrimination.   Rather, Defendant presents evidence supporting legitimate, non-discriminatory reasons for terminating Plaintiff; i.e., that, based on observations of his conduct, it appeared that he was not interested in his new position and was not adequately performing in this new position.   Defendant then argues that Plaintiff cannot show that these reasons were a mere pretext for age discrimination.

Plaintiff responds that (1) Defendant did not meet its evidentiary burden of showing that Plaintiff was terminated for legitimate, non-discriminatory business reasons;  and (2) even if it did, Defendant's proffered reasons for his termination were a  mere pretext for unlawful age bias because (a) they have no basis in fact, and (b) the termination decision was actually motivated by unlawful age bias.

### 1.   Legitimate, Non-discriminatory Reasons for Termination

Contrary to Plaintiff's arguments here, Defendant has presented evidence supporting the legitimate, non-discriminatory reasons given for the employment action Plaintiff challenges.   Plaintiff's immediate supervisor, Fredrik Moller, had received reports from others concerning Plaintiff's poor job performance and had witnessed it himself.   He told Peter Moller at Defendant's parent company about this and Peter Moller had, based in part on his own observations of Plaintiff's job performance, concluded that Plaintiff should be terminated.   (F. Moller Dep. at 41-55; Timmins Dep. at 36-40, 45-46; P. Moller Dep. at 65-66.)[3]

### 2.   Pretext

---

[3]Plaintiff's denial that he actually fell asleep at a meeting does not render false the testimony by many that he gave the appearance that he was sleeping at meetings thus giving the appearance of a lack of interest in his new position.

12

Because Defendant satisfied its burden of showing that it had legitimate, non-discriminatory reasons for Plaintiff's termination, the burden of production now returns to Plaintiff.  Plaintiff is required "to show the existence of evidence sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff."  *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 526 (Mich. 2001) (internal quotation and citation omitted).  To prove pretext and intentional age discrimination, Plaintiff "must directly confront the asserted justification" for his employer's actions.  *Rowan*, 360 F.3d at 550.

Plaintiff attempts to show pretext by showing that Defendant's proffered reasons for his termination:  (1) had no basis in fact; and (2) did not actually motivate Defendant's termination decision.

### a.  No Basis in Fact

Plaintiff first argues that Defendant's claim that he was terminated for poor performance has no basis in fact because (1) no one told Plaintiff about these concerns before he was terminated, (2) there is no written documentation of his poor performance, (3) Defendant provided him with severance payments that were not required under his employment agreement if he was terminated for cause, and (4) Defendant had, in fact, told Plaintiff that he was a good performer.  Plaintiff thus argues that deposition testimony by Fredrik Moller and Peter Moller, that Plaintiff was terminated based on their own personal observations and based on complaints from co-workers and outside distributors, "defies logic and credibility."  (Pl.'s Resp. at 17.)  This Court disagrees.

Plaintiff ignores that there is additional deposition testimony that corroborates the testimony of Fredrik Moller and Peter Moller that Plaintiff appeared to be sleeping at

13

meetings, was on the internet instead of working, lacked enthusiasm and interest in his new job, and was not adequately performing his duties.  (Timmins Dep. at 36-40, 45-46; Bulow Dep. at 62-66; Thorsrud Dep. at 35-37.)  That neither Fredrik nor Peter told Plaintiff about their concerns with his job performance, or put those concerns in writing, does not mean that there was no factual basis for Plaintiff's termination and that it was merely a pretext for age discrimination.  The same is true with regard to Defendant's decision to provide Plaintiff with severance payments.  It may not have been wise for Defendant to not make a written record of its dissatisfaction with Plaintiff's performance or to make sure that he was informed of their dissatisfaction thus giving him an opportunity to improve before being terminated.  Likewise, it may not have been prudent for Defendant to make severance payments to Plaintiff when they may not have been required.  Nonetheless, the evidence presented here shows that Defendant's termination decision was  a "reasonably informed and considered" decision.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).   It was not a decision that had no basis in fact or "'was so ridden with error that defendant could not honestly have relied upon it.'"  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (quoting *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988)).

Plaintiff also attempts to show pretext by presenting evidence that Defendant considered him a good worker in his pre-merger position. This argument, however, misses the mark.  It is not disputed that Defendant recognized that Plaintiff performed well in his previous position.  The challenged employment action arose from complaints that Plaintiff was unable to adequately perform his post-merger position.   There is corroborating deposition testimony that these complaints did exist.  His personal beliefs that his work habits were adequate are insufficient.  As observed by the Sixth Circuit, "'[m]ere personal

14

beliefs, conjecture and speculation are insufficient to support an inference of age discrimination.'" *Wexler*, 317 F.3d at 584 (quoting *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 168 (6th Cir. 1986)).  Moreover, as observed by the Michigan Supreme Court, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Hazel,* 628 N.W.2d at 527 (internal quotes and citation omitted).

### b.  Actual Motivation for Termination Decision

Plaintiff also argues that Defendant's dissatisfaction over his job performance was just a pretext for a termination decision actually motivated by an unlawful bias against age.  To support this argument, Plaintiff contends that the following is circumstantial evidence of age bias:  (1) Peter Moller's concerns about Plaintiff's lack of energy in his post-merger position; (2) the fact that, in late Fall 2001, when Peter Moller first met with Anders Hoberg about being a consultant, he was also considering Hoberg (a 35-year-old Swede) as a possible replacement for Plaintiff; and (3) the fact that Defendant's global parent company collected employee age data, used that data to calculate the average age of its employees in each division on a quarterly basis, and set goals to maintain an average age for divisions that was often below age 40 (the protected age group).  The Court addresses each of these arguments in turn.

### (i)  Peter Moller's "Lack of Energy" Comments

The Court rejects Plaintiff's argument that a reasonable jury could infer age bias from Peter Moller's testimony.  When asked what he meant about Plaintiff's apparent lack of energy, Peter Moller explained:

15

I got the impression that he was not that interested, number one, and I mean really his body language, what he said, his presentation didn't reflect that really this is what I'm interested, this is what I think is fun. And also the tempo of the presentation, etc., and in connection to that, I got the impression that he came quite late and left quite early physically in the days. So you can base on what he said, on the material he presented, but also his body language. I would say it was absolutely obvious there was something wrong.

* * *

. . . . Compared to his presentations in the assembly system, where his whole body, he was enthusiastic, he pointed, he showed emotions, etc., in a completely different way than he did in his new position.

And then we can go into the pure presentation, the substance, etc., that I don't think was sharp enough. It was not worked through enough, was not clear enough, and I didn't think was good enough.

(P. Moller Dep. at 66-67.) There is nothing in this testimony that would support an inference of age bias.

### (ii) Late Fall 2001 Meeting With Anders Hoberg

By mid-October 2001, both Peter Moller and Fredrik Moller testified that they were unhappy with Plaintiff's job performance. At that time, Peter Moller requested a meeting with Plaintiff. (Def.'s Ex. E, 10/9/01 e-mail to Plaintiff.) At that meeting, Peter Moller told Plaintiff that Plaintiff would not be replacing Fredrik as President, that "it was better for him personally to start to find another job", and that he would support him because he thought he did a good job in his previous position before the merger. (P. Moller Dep. at 73-74.) Plaintiff testified that Peter Moller told him that the opportunity to replace Fredrik was gone because Fredrik was staying longer. (Johnson Dep. at 50.) He did not mention Plaintiff's poor job performance.

Plaintiff subsequently made efforts to find a new job. (Johnson Dep. at 55-59.)

In March 2002, Anders Hoberg, a 35-year-old Swede began working as a consultant

16

for Defendant, a position he first interviewed for in late Fall 2001.  (Hoberg Dep. at 87-92;
P. Moller Dep. at 87-92.)

Peter Moller testified that, although only the consulting job was discussed with Hoberg
at the late Fall 2001 initial meeting, both Peter and Fredrik Moller had doubts at that time
about Plaintiff's ability to adequately perform his post-merger position and considered
whether Hoberg would be a possible candidate to replace Plaintiff, if necessary, in the
future.  They also considered whether Hoberg would be a possible candidate for other jobs
within the organization that might open up.  (P. Moller Dep. at 89-92; Livijn Dep. at 18, 78-
81.)  "What we talked with Anders Hoberg was to come back to the company, get
employment.  We didn't discuss the specific job with Anders Hoberg.  That was something
that Fredrik and I discussed as a possibility medium term within a two-year period or
something.  The only thing we discussed with Hoberg was to come back to the company
and start on this consultant job as the first step."  (P. Moller Dep. at 92.)

It was not until March 2002 that the decision was made to hire Mr. Hoberg as a
consultant.  (Livijn Dep. at 81.)  At that time, it was over four months since Defendant had
advised Plaintiff to look for a new job, and Plaintiff had been actively seeking a new job.

On April 30, 2002, Plaintiff learned that he was going to be terminated even though
he had not yet found a new job.  He did not return to work after that date but refused to sign
a separation agreement.

On August 31, 2002, Plaintiff was terminated.  At that time, Defendant paid him a total
of $290,632.19.

In September 2002, Anders Hoberg was hired to replace Plaintiff.

This circumstantial evidence establishes the fourth element of Plaintiff's prima facie

17

case of age discrimination; i.e., that he was ultimately replaced by a younger worker.  It does not give rise to a reasonable inference that Defendant's proffered business reasons for Plaintiff's termination were a mere pretext for unlawful age discrimination.  There is ample testimony that, at the time of the late Fall Hoberg interview, Peter Moller was dissatisfied with Plaintiff's performance and had informed Plaintiff that he would not be replacing Fredrik and should begin looking for a new job.  There is no evidence, circumstantial or otherwise, that Defendant's dissatisfaction with Plaintiff's performance, the decision to have Fredrik serve longer as President of the post-merger company, or the decision to advise Plaintiff that he should begin looking for a new job, were because of Plaintiff's age.

### (iii)    Global Parent Company's "1OR Reports" and "Score Cards"

The Court now considers Plaintiff's argument that, because Defendant's parent company collected and tracked age-related data and set "average age" goals for its divisions, a reasonable jury could infer that Defendant's proffered business reason for his termination was a mere pretext for a decision actually motivated by age discrimination. (Pl.'s Ex. 5, 1OR for first and second quarters 2001; Pl.'s Ex. 6, People Management Overview ("Score Cards") dated May 2002 using data reported in 1OR for Q1 of 2002.)

There is evidence that the parent company collected and tracked age data globally, setting goals for "average ages" in all global divisions until Plaintiff told the Human Resource Manager of his pre-merger Division to inform the Human Resource Manager of the global parent company that it was unlawful to do this in the United States.  (Johnson Dep. at 11-12, 86; Brown Dep. at 29-36; Livijn Dep. at 30, 44-46.)  Peter Moller did not specifically ask the global Human Resource Manager, Jeannette Livijn, to collect or analyze

18

age-related data or to provide him with age information regarding his general managers. (P. Moller Dep. at 19-20; J. Livijn Dep. at 35-36.)  Peter was not involved in setting any age-related goals.  This was done solely by Jeannette Livijn.  More importantly, Peter did not use this information for hiring or firing decisions.  (P. Moller Dep. at 21-22, 25-26, 29, 40, 42-43.)

Evidence from 2001 and 2002 indicates that this data was not reported for the United States.  (Pl.'s Ex. 5, 1OR Output Reports for 1st and 2nd quarters 2001 indicating that age bracket information "NB: not for US").  Nonetheless, there is deposition testimony from Defendant's Human Resource Manager that she, on at least one occasion, did provide age-related data for Michigan workers to the global parent company's Human Resource Manager, Jeannette Livijn, over the telephone.  (Brown Dep. at 73-75.)  In fact, May 2002 documents, Pl.'s Ex. 6,  prepared by Jeanette Livijn for her use in a presentation at a global Business Board meeting, include two different "score cards" titled "Average age Q1 2002." (Livijn Dep. at 47-48.)  The first, Bates #00180, lists the average age for all companies under the global umbrella of Atlas Copco Tools and Assembly Systems Division including an average age of 35.1 years for the  Farmington Hills "Customer Center" but none for the Sterling Heights "Application Center" as well as a summary box at the top stating, "The average age for the division is today 38 years.  We want to stay at this level."  (Pl.'s Ex. 6, Bates # 00180.)  Also within this same presentation is a score card titled "Average age - Q1 2002" with the additional notation at the top:  "This Score Card is only applicable outside North America."  This document lists the average age for both the Farmington Hills (35.1) and Sterling Heights (41.0), Michigan locations and contains a summary box at the top stating, "Target outside North American:  We want to stay at the level of 38."  (Pl.'s Ex.

19

6, Bates #00193.)  Also, included in this Exhibit 6, there is a document titled "Age Structure" that tracts the average age of general managers (Presidents) for the various divisions in the global parent company from 1997 and 1998, sets a target for 1999, and a goal for 2001. Both the 1999 target and 2001 goal are slightly lower than the actual average age for the years 1997-98.  (Pl.'s Ex. 6, Bates #00207.)  That document was prepared by Jeannette Livijn well before the merger and with no input from anyone else.  (Livijn Dep. at 36-37.) That document also "highlights" companies with the highest average age, listing "Assembly Systems" (among others) with the average age of 45 years as one.  (*Id.*)  Peter Moller clarified that 90 percent of the employees in the Assembly Systems Division are located outside the United States.  (P. Moller Dep. at 28.)

When viewed in the light most favorable to Plaintiff, this evidence will not allow a reasonable jury to find that Plaintiff was terminated because of his age.  These documents were not prepared by those that made the decision to terminate Plaintiff and are remote in time from that decision.  Moreover, contrary Plaintiff's arguments here, these documents were not prepared by or used by Peter Moller, the equivalent of the high level officials in the cases Plaintiff relies upon.  Accordingly, this is not the sort of evidence that would allow a reasonable inference that the decision to terminate Plaintiff was influenced by a corporate culture of unlawful age discrimination.

As the Sixth Circuit observed, "the ADEA was not intended to prevent an employer from achieving a reasonable age balance in [its] employment structure.'"  *Rowan*, 360 F.3d at 548 (quoting *Laugesen v. Anaconda Co.*, 510 F.2d 307, 312 n. 4 (6th Cir. 1975)). Moreover, in this case, there is no evidence that the individual who collected and reported the average-age data and set goals was involved in or influenced the decision to terminate

Plaintiff.  There is no evidence that Fredrik Moller or Peter Moller consulted or considered this or any other age-related data or written statements concerning average age goals in connection with the decision to terminate Plaintiff for poor performance.  "Statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden of demonstrating animus."  *Rowan*, 360 F.3d at 550 (internal quotations and citations omitted).

Similar to the Sixth Circuit's conclusion in *Rowan*, such unconnected evidence is insufficient to find that Defendant's lawful reasons for Plaintiff's termination were a pretext for age discrimination.  "In order to prove discrimination, . . . the plaintiff[] must directly confront the asserted justification for the discharge."  *Rowan*, 360 F.3d at 550 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).  "[T]o survive a summary judgment motion [the plaintiff] must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful age-discrimination, not that other reasonable decision-makers might have retained the plaintiff[]."  *Rowan*, 360 F.3d at 550.  Defendant offered evidence that Plaintiff was selected for termination for legitimate reasons, and Plaintiff has not presented evidence showing that the reasons proffered had no basis in fact and that Defendant's decision was actually motivated by unlawful age discrimination.

## B.  National Origin Discrimination

Plaintiff argues that he has direct evidence of national origin discrimination, presenting the following testimony from Fredrik Moller about why Anders Hoberg was his candidate for Plaintiff's replacement:

Q:  Mr. Hoberg was your candidate for the position, correct?

21

A:  Yes.

Q:  Did you feel that he had some advantage in terms of being considered for the position because he was a Swede?

A:  No.

Q:  Do you think that being Swedish provides him with some greater benefit to the company because it's a Swedish company?

A:  I think so, yes.

Q:  Why do you think that?

A:  I think it is easier for him to have a good communication with the marketing people and the product development people in Sweden.

* * *

Q:  Well, the people in Sweden, don't they speak English?

A:  Many people speak English.  More people don't speak English.

(F. Moller Dep. at 101-02.)

If Plaintiff presents direct evidence of discrimination, there is no need for the Court to "go through the *McDonnell Douglas* burden-shifting analysis."  *Rowan*, 360 F.3d at 548; *DeBrow v. Century 21 Great Lakes, Inc.*, 620 N.W.2d 836, 838 (Mich. 2001.)  "Direct evidence is evidence that proves the existence of a fact without requiring inferences. *Rowan*, 360 F.3d at 548.

Despite his arguments to the contrary, the above deposition testimony does not prove, without inference, that Plaintiff was terminated because of his national origin.  In fact, several inferences must be drawn from Mr. Moller's testimony, that he felt Hoberg's language skills gave him a hiring advantage over candidates that did not speak Swedish, to arrive at Plaintiff's conclusion that Plaintiff was terminated because he is a United States

22

citizen.   Accordingly, this testimony cannot be considered direct evidence of unlawful national origin discrimination.

Plaintiff does not argue that, under the *McDonnell Douglas* burden-shifting analysis, he can present circumstantial evidence that defeats Defendant's motion for summary judgment on his claim of national origin discrimination under Michigan's ELCRA. Accordingly, Defendant's motion as to that claim is granted.

## IV.   Conclusion

For the above-stated reasons, Defendant's motion *in limine* is DENIED and its motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  October 16, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 16, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager